UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANGIE S., | |
| Plaintiff, | No. 21 C 5978 |
| v. | Judge Thomas M. Durkin |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | |
| Defendant. | |

**MEMORANDUM OPINION AND ORDER**

Angie S. ("Claimant") brings this action under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Commissioner of Social Security denying her claim for disability insurance benefits, widow's insurance benefits, and supplemental security income. The Commissioner filed a motion for summary judgment [18]. For the following reasons, the Commissioner's motion is denied.

**Background**

**I.    Procedural History**

Claimant filed Title II applications for widow's insurance benefits and disability insurance benefits on July 31, 2019 and August 29, 2019, respectively.[1] R. 15. She also filed a Title XVI application for supplemental security income on December 18, 2019. *Id.* All applications pertain to a disability beginning on July 30, 2019. *Id.* The claims were denied initially on April 13, 2020 and again upon

---

[1] References to the Administrative Record (ECF No. 12) are cited as "R. #."

1

reconsideration on September 21, 2020. *Id.* Claimant filed a request for a hearing before an Administrative Law Judge (ALJ) on November 9, 2020 and attended and testified at a telephone hearing on March 2, 2021. *Id.* The ALJ issued a decision denying benefits on March 31, 2021. *Id.* at 12. Plaintiff sought review from the Appeals Council, which denied her request on September 3, 2021. *Id.* at 1. Claimant then filed a timely request for review in this Court.[2]

## II. Factual Background

### A. Medical Record Evidence

Claimant had a kidney transplant in 2005 and was diagnosed with dyspnea on exertion[3] (DOE) in 2016. *Id.* at 354, 380. At a July 2019 nephrology visit, her physical examination was normal with noted blood pressure issues. *Id.* at 386. In August 2019, Claimant visited a cardiologist regarding increased DOE, and her physical examination showed clear lungs, normal heart function, mild lower extremity edema, and "stable class II symptoms."[4] *Id.* at 356-58. At a second cardiology visit in

---

[2] Claimant recognizes that she "cannot be found disabled under the Widow's claim because her alleged onset of disability began on July 30, 2019, and the prescribed period for the Widow's benefits ended on February 28, 2006." ECF No. 15 at 1 n.1 (citing 20 C.F.R. § 404.335); *see also* R. 40-41.
[3] Dyspnea on exertion refers to "shortness of breath [that] is present with exercise and improves with rest." Sandeep Sharma et al., *Dyspnea on Exertion*, Nat'l Library of Med. (Aug. 18, 2022), https://www.ncbi.nlm.nih.gov/books/NBK499847/.
[4] Per the New York Heart Association (NYHA) Classification, an individual with "class II" symptoms has a slight limitation of physical activity, is comfortable at rest, and ordinary physical activity results in fatigue, palpitation, and/or dyspnea. *See* American Heart Association, "Classes of Heart Failure" https://www.heart.org/en/health-topics/heart-failure/what-is-heart-failure/classes-of-heart-failure.

November, the provider observed Claimant's DOE was stable and had improved with medication. *Id.* at 362. Claimant's echocardiogram that month showed normal findings, consistent with the prior year. *Id.* at 730-31.

In January 2020, Claimant visited her primary care physician, Dr. Iram Ahmed, who observed that she had normal motor strength, no edema, and obesity. *Id.* at 414. Around that time, Claimant presented with normal heart function and range of motion at her nephrology visit, and a bone density scan showed osteoporosis. *Id.* at 743, 1004-05. Claimant had a consultative examination in March 2020, where she reported shortness of breath, back pain, and other joint pain. *Id.* at 688. The internist observed that Claimant had morbid obesity, normal range of motion of her cervical spine, shoulders, elbows, wrists, knees and ankles, normal motor and grip strength, an ability to walk unassisted with "a slow waddling type of gait," normal respiratory rate, and no edema. *Id.* at 690-91. Additionally, she showed a reduced range of motion in the lumbar spine and hips, and an x-ray revealed degenerative changes in her lumbar spine. *Id.* at 690-91, 93. That month, Claimant began physical therapy for back and knee pain and was also hospitalized for COVID-19. *Id.* at 834, 1278-1326.

In August 2020, Claimant visited Dr. Ahmed complaining of worsening back and knee pain. *Id.* at 1231. He observed normal motor strength and no edema. *Id.* Claimant was discharged from physical therapy in September 2020 with continued impaired core strength, lumbar spine soft tissue mobility, lumbar range of motion, and hip and knee strength and range of mobility. *Id.* at 1266-67. The discharge

3

summary noted her improved standing and walking tolerance, lumbosacral range of motion, core and hip strength, and knee strength and range of motion. *Id.*

In October 2020, Claimant's cardiologist observed that she had DOE with stable class II symptoms. *Id.* at 1173. Pulmonary function testing revealed a "mild obstructive ventilatory defect" and that "the decreased diffusing capacity suggests the presence of emphysema." *Id.* at 1145. Her pulmonologist subsequently reported that Claimant had DOE with a suspected "mild degree of diastolic failure" and normal gait and muscle tone. *Id.* at 1116, 1117, 1119. Imaging that month also revealed degenerative changes in her left knee and lumbar spine. *Id.* at 1248-52. And in November, Claimant presented with "episodic DOE" but an otherwise normal physical examination at her nephrology visit. *Id.* at 1213.

At a follow up in January 2021, her pulmonologist observed normal gait and muscle tone with some edema, "chronic diastolic heart failure," and spoke to Claimant about the need to walk and exercise. *Id.* at 1049, 1052. That month, Claimant also visited an orthopedic surgeon regarding her left knee pain. *Id.* at 1074. The provider found that Claimant showed a good range of motion, normal strength, and intact sensation with no gross motor weakness of the hip, ankle, and knee. *Id.* at 1078-79. An x-ray of her knee revealed some degenerative changes, joint space narrowing, and mild osteoarthritis, and the provider spoke to Claimant about lifestyle changes including low impact exercise. *Id.* at 1079-80. Claimant also visited Dr. Ahmed that month regarding back, knee, and chest pain, and he observed that she had normal motor strength, no edema, and morbid obesity. *Id.* at 1223.

4

B. <u>Medical Opinion Evidence</u>

Dr. Ahmed submitted two medical source statements. In the first statement dated January 31, 2020, Dr. Ahmed noted Claimant's ability to ambulate without an assistive device and 5/5 bilateral grip strength, with no limitations in her ability to handle objects or reach overhead. *Id.* at 372. He opined that she could stand for 10-20 minutes, walk for 5-10 minutes, and needed to stand for 10-20 minutes after sitting for 30 minutes. *Id.*

In the second statement dated August 18, 2020, Dr. Ahmed opined that Claimant could only walk half a block, sit for 20 minutes and stand for 45 minutes at one time, and sit for about 2 hours and stand or walk for less than 2 hours in a normal working day. *Id.* at 1028-29. He stated that Claimant needed to walk for 15 minutes every 45 minutes and take unscheduled 30-minute breaks as often as every hour or two due to muscle aches, fatigue, joint pain, adverse effects of medication, and her history of lupus and kidney transplant. *Id.* at 1029. He further noted that she should elevate her leg at least 45 degrees during prolonged sitting and must use a cane during occasional standing or walking. *Id.* Dr. Ahmed also opined that she could lift less than 10 pounds rarely, use her hands and fingers for handling objects 25-40% of the time, and use her arms for reaching overhead 10-25% of the time. *Id.* at 1029. He opined that she would likely be absent more than four days per month. *Id.* at 1030.

State medical consultants also submitted opinions at the initial and reconsideration levels, finding Claimant capable of light work with postural limitations. *Id.* at 69-94, 98-128.

C. <u>Hearing Testimony</u>

At the hearing before the ALJ, Claimant testified that she left her job as a bus driver due to shortness of breath, knee, neck, and shoulder pain, arthritis in her fingers, and grip weakness. *Id.* at 57-58. She stated that she could not stand or walk for more than 30 minutes because of back, knee, and hip pain, and that she could not sit for more than one hour before her knees start hurting. *Id.* at 59. She further stated that her legs and feet swelled with significant walking, so she elevated her legs when seated, and that her medication caused fatigue. *Id.* at 60-61.

Dr. Joseph Gaeta, an impartial medical expert, testified at the hearing regarding Claimant's limitations. Dr. Gaeta stated that based on his review of the record, Claimant had a history of lupus, kidney disease and transplant, and hypertension, with no significant recent changes. *Id.* at 43. Dr. Gaeta further testified as to Claimant's recent history of back and knee pain, stating, "I don't see that, you know, significantly evaluated." *Id.* He noted the March 2020 finding of normal bilateral strength, some "abnormal" limitation in range of motion of the hip and back, and a report of an x-ray which showed "not . . . significant changes." *Id.* at 42-44. Dr. Gaeta further testified that Claimant was morbidly obese. *Id.* Dr. Gaeta discussed the listings he considered, and opined that Claimant, due to her obesity and back and knee issues, would be limited to light level work with postural but no environmental limitations. *Id.* at 45-46. On cross-examination, when Dr. Gaeta stated he would have liked to see more imaging studies and an orthopedic evaluation, counsel pointed out Claimant's visit with the orthopedic surgeon and the x-rays in the record. *Id.* at 50-

6

51. After review of the record, Dr. Gaeta explained that he was focused on the physical examination showing normal strength and range of motion and the lack of a "severe abnormality" in the knee. *Id.* at 51-52.

Vocational expert Gary Wilhelm also testified at the hearing. He described Claimant's past work and cited the comparable positions from the Dictionary of Occupational Titles for reference. *Id* at 62. The ALJ asked Wilhelm to consider a hypothetical individual of Claimant's age, education, and work experience with a specific set of limitations:

> This person could lift 20 pounds occasionally, 10 pounds frequently. Stand and walk six hours in an eight-hour day, sit for up to six hours in an eight-hour day with normal breaks. This person could never climb ladders, ropes or scaffolds. Could never crawl. Could only occasionally climb ramps or stairs, balance, stoop, crouch and kneel. This person must avoid concentrated exposure to respiratory irritants such as fumes, odors, dust and gases. Must avoid concentrated exposure to dangerous moving machinery. And must avoid all exposure to unprotected heights.

*Id.* at 63. Wilhelm stated that such a person could not perform Claimant's past work because bus driving is not conducive to the environmental limitations. *Id.* Wilhelm further testified that other jobs that such a person could perform existed in substantial number in the national economy. *Id.* at 64.

### D. The ALJ's Decision

To determine whether an individual is entitled to disability insurance benefits, an ALJ must follow the five-step analysis set out at 20 C.F.R. § 404.1520(a)(4). At step one, if the ALJ determines that the claimant is "doing substantial gainful activity," then the claimant is not disabled, and no further analysis is necessary. If the claimant is not engaged in gainful activity, at step two, the ALJ must determine

7

whether the claimant has a "severe" impairment or combination of impairments. If the ALJ finds that the claimant has such a severe impairment, and the impairment is one provided for in the Social Security regulation listings, then at step three, the ALJ must find that the claimant is disabled. If the ALJ finds that the impairment is not in the listings, then at step four, the ALJ must assess the residual functional capacity ("RFC") the claimant continues to possess despite the claimant's impairment. If the claimant's RFC enables the claimant to continue his or her "past relevant work," then the ALJ must find that the claimant is not disabled. But if the claimant cannot perform past relevant work, at step five, the ALJ must determine whether the claimant "can make an adjustment to other work." If the claimant cannot make such an adjustment, then the claimant is disabled.

The ALJ first found that Claimant had not engaged in substantial gainful activity since July 30, 2019, and that Claimant had severe impairments of lupus controlled with plaqunil/steroid therapy, history of kidney transplantation in 2005 with stable hypertension, obesity, degenerative joint disease of the left knee, degenerative disc disease of the lumbar spine, and osteoporosis. R. 18. The ALJ concluded that the impairments did not meet or medically equal the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926). *Id.*

The ALJ then determined that Claimant had the RFC to:

[P]erform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b) except the claimant can never crawl nor climb ladders, ropes, or scaffolds[;] can no more than occasionally climb ramps or stairs, balance, stoop, crouch, and kneel[;] [and] must avoid concentrated exposure to

8

> respiratory irritants, such as fumes, odors, dusts and gases[,] . . . concentrated exposure to dangerous moving machinery and all exposure to unprotected heights."

*Id.* at 20. The ALJ stated that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but concluded that her "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" *Id.* at 26.

In support of his RFC assessment, the ALJ reviewed Claimant's testimony and the medical evidence and opinions. The ALJ first summarized Claimant's testimony regarding her back, knee and hip pain; difficulty walking, standing, sitting, kneeling, lifting, and climbing stairs; leg swelling; forgetfulness; and fatigue from her lupus medication. *Id.* at 21. He pointed to her reported back and joint pain and shortness of breath in assessing an RFC with limited physical maneuvers, frequency of movement, and exposure to respiratory irritants, dangerous moving machinery, and unprotected heights. *Id.* at 23-24.

In determining that more restrictive limitations were not warranted, the ALJ emphasized Claimant's generally normal physical examinations, absence of edema except for some instances, exercise recommendations from two providers, the lack of support for the physical therapy discharge summary in the form of treatment notes, the "essentially" normal strength and range of motion in her knee, hip, and ankle reported by the orthopedic surgeon, and the lack of a significant abnormality in the x-ray of her knee. *Id.* at 24. The ALJ also pointed to her well-controlled lupus and hypertension and stable kidney function and absence of "medically determinable

impairments to explain" Claimant's reported DOE, citing the normal echocardiograms from 2018 and 2019, normal lung examinations, normal stress test from 2018, and mild obstruction. *Id.* The ALJ further stated that Claimant's obesity could reasonably be expected to limit her mobility and tolerance for exertion. *Id.* at 25.

The ALJ found that Dr. Gaeta's opinion was persuasive because it was "supported by the record, as Dr. Gaeta is familiar with the disability program and its rules and had the opportunity to review the claimant's record in its entirety. Therefore, Dr. Gaeta's opinion is the most informed and consistent with the overall record." *Id.* at 26. The ALJ also found the state medical consultants' opinions persuasive because they were consistent with the treatment records and Dr. Gaeta's opinion. *Id.* at 25. Nevertheless, the ALJ determined that additional limitations as to respiratory irritants, dangerous moving machinery, and unprotected heights were appropriate given Claimant's reported shortness of breath and any instability or limited mobility. *Id.* at 26.

The ALJ further found that Dr. Ahmed's January 2020 opinion was of some persuasive value because it was consistent with the record regarding the use of upper extremities and gross manipulation, but inconsistent with the relatively normal physical examinations. *Id.* Additionally, the ALJ found that Dr. Ahmed's August 2020 opinion was unpersuasive because it was not supported by the treatment notes or consistent with the evidence as a whole. *Id.* The ALJ explained that the restrictive limitations were inconsistent with the physical examinations, Dr. Ahmed did not

10

explain the need for unscheduled breaks or a high rate of absence, and the record did not include a recommendation for leg elevation but instead generally showed no edema. *Id.*

Although the ALJ determined that Claimant's RFC did not enable her to perform the full range of light work, he concluded—based on the vocational expert's testimony—that jobs existed in significant numbers in the national economy that she could perform. *Id*. at 27-28. Accordingly, the ALJ found that Claimant was not disabled. *Id*. at 28.

## Legal Standard

Judicial review of a final decision of the Social Security Administration is generally deferential. The Social Security Act requires the court to sustain the ALJ's findings if they are supported by substantial evidence. *See* 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). The court should review the entire administrative record, but must "not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute [its] own judgment for that of the [ALJ]." *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). "However, this does not mean that [the court] will simply rubber-stamp the [ALJ's] decision without a critical review of the evidence." *Id*. A decision may be reversed if the ALJ's findings "are not supported by substantial evidence or if the ALJ applied an erroneous legal standard." *Id.*

In addition, the court will reverse if the ALJ does not "explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review."

11

*Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). "Although a written evaluation of each piece of evidence or testimony is not required, neither may the ALJ select and discuss only that evidence that favors his ultimate conclusion." *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994); *see also Scrogham v. Colvin*, 765 F.3d 685, 698 (7th Cir. 2014) ("This 'sound-bite' approach to record evaluation is an impermissible methodology for evaluating the evidence."). Additionally, the ALJ "has a duty to fully develop the record before drawing any conclusions," *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007), and deference in review is "lessened . . . where the ALJ's findings rest on an error of fact or logic," *Thomas v. Colvin*, 745 F.3d 802, 806 (7th Cir. 2014). In oft-quoted words, the Seventh Circuit has said that the ALJ "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.

When the ALJ has satisfied these requirements, the responsibility for deciding whether the claimant is disabled falls on the Social Security Administration, and if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled," the ALJ's decision must be affirmed. *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir. 1990).

## Analysis

Claimant asserts the ALJ failed to support his findings with substantial evidence on three fronts: (1) the ALJ improperly credited Dr. Gaeta's opinion and discounted Dr. Ahmed's August 2020 opinion; (2) the ALJ failed to evaluate Claimant's subjective symptoms; and (3) the ALJ included additional limitations in

12

the RFC that did not accommodate Claimant's symptoms. The Court will examine each argument in turn.

## I. Evaluation of Medical Opinion Evidence

Claimant first argues that the ALJ failed to offer a specific reason for finding Dr. Gaeta's opinion persuasive or examine discrepancies and inaccuracies in his testimony. Claimant further argues that the ALJ failed to pinpoint records showing that Dr. Ahmed's August 2020 opinion was not supported by treatment notes or the evidence as a whole and ignored the consistency between the opinion and other evidence.

For claims filed after March 27, 2017, the old "treating physician rule" has been replaced by 20 C.F.R. § 404.1520c. Accordingly, treating physicians' opinions are no longer entitled to presumptive controlling weight; the ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from [a claimant's] medical sources." 20 C.F.R. § 404.1520c(a). Rather, the ALJ considers the persuasiveness of the medical opinions using several factors: supportability, consistency, relationship with the claimant, specialization, and other factors that tend to support or contradict the opinion. *Id.* at §§ 404.1520c(a)-(c). Supportability and consistency are the most important factors and the only factors that must be articulated in the final decision. *Id.* at §§ 404.1520c(a), (b)(2). "Supportability measures how much the objective medical evidence and supporting explanations presented by a medical source support the opinion," whereas "consistency assesses how a medical opinion squares with other

13

evidence in the record." *Michelle D. v. Kijakazi*, No. 21 C 1561, 2022 WL 972280, at *4 (N.D. Ill. Mar. 31, 2022) (citing 20 C.F.R. §§ 404.1520c(b)(1), (2)). While the ALJ generally need only minimally articulate his reasoning for how he assessed a medical opinion, he must still consider the regulatory factors and build a "logical bridge" from the evidence to his conclusion. *See Evonne R. v. Kijakazi*, No. 20 C 7652, 2022 WL 874650, at *5 (N.D. Ill. Mar. 24, 2022) (citing *Grotts v. Kijakazi*, 27 F.4th 1273, 1277 (7th Cir. 2022)).

Here, the ALJ did not adequately analyze the supportability and consistency of Dr. Gaeta's opinion. The ALJ explained that Dr. Gaeta's opinion was "supported by the record" because he was familiar with the disability program and had the opportunity to review the record. R. 26. On that basis, the ALJ stated that Dr. Gaeta's opinion was the "most informed and consistent with the overall record." *Id.* But these are "conclusion[s], not a reason (or reasons)" for them. *Mueller v. Astrue*, 493 F. App'x 772, 776 (7th Cir. 2012). On supportability, while Dr. Gaeta's knowledge of the disability program was certainly a valid consideration, *see* § 404.1520c(c)(5), it says nothing about the objective medical evidence or explanations underlying Dr. Gaeta's opinion. Further, the fact that Dr. Gaeta had access to the record does not necessarily mean he reviewed it or his opinion was supported by it. On consistency, the ALJ deferred to boilerplate and provided "no indication of which portions of the record might actually be consistent." *See Schmidt v. Colvin*, 545 F. App'x 552, 557 (7th Cir. 2013) (rejecting similar language as "entirely unhelpful" boilerplate); *Patrice W. v. Kijakazi*, 20 C 02847, 2022 WL 2463557, at *3 (N.D. Ill. July 6, 2022) (finding that an

ALJ's statement that agency consultants' opinions were "consistent with the record as a whole," without more, was insufficient).

The Commissioner urges that when read as a whole, the ALJ's opinion satisfies the regulations. To be sure, the ALJ recounted Dr. Gaeta's testimony on Claimant's impairments, listings for consideration, and limitations. But, in reviewing the opinion in its entirety, the Court cannot piece together how the ALJ reasoned that Dr. Gaeta's testimony was supported by and consistent with the overall record. Instead, parts of the ALJ's opinion call into question the supportability and consistency of Dr. Gaeta's opinion. For example, the ALJ cites Dr. Gaeta's testimony that the record was "devoid of any significant evaluation" of Claimant's back and knee pain, yet several pages earlier, summarizes Claimant's visit to an orthopedic surgeon and imaging that showed degenerative changes in her lumbar spine and osteoarthritis in her knee. R. 23, 25. The ALJ must "articulate adequately the bases for his conclusions" as to the persuasiveness of medical opinions so that the Court can "trace the path of [his] reasoning." *Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). The ALJ failed to do so with respect to Dr. Gaeta.

However, the ALJ sufficiently evaluated the supportability and consistency of Dr. Ahmed's August 2020 opinion. Though the ALJ began with boilerplate conclusions that Dr. Ahmed's opinion was "not supported by the treatment notes" or "consistent with the evidence as a whole," R. 26, he did not end his analysis there. The ALJ explained that the limitations were "contrary to physical examinations." *Id*. Claimant asserts that this brief reference to "physical examinations" does not pass

15

muster. But here, unlike with Dr. Gaeta's opinion, the "earlier section contained the missing analysis." *Cf. Evonne*, 2022 WL 874650, at *4. The ALJ previously clarified that more restrictive limitations were not appropriate because notwithstanding "some instances of decreased range of motion," Claimant's "physical examinations have generally been normal with no neurological deficits including normal strength and intact sensation," citing extensively to treatment notes from both Dr. Ahmed and Claimant's other providers between April 2019 and January 2021. R. 24. This is not "mere summary" but rather "meaningful analysis" that bears directly on the supportability and consistency of Dr. Ahmed's more restrictive limitations on standing, walking, sitting, lifting, and handling. *Jennifer S. v. Kijakazi*, No. 3:20-CV-50239, 2022 WL 279554, at *6 (N.D. Ill. Jan. 31, 2022). That the ALJ did not repeat these details in the paragraph discussing Dr. Ahmed's August 2020 opinion is not fatal. *See Gedatus v. Saul*, 994 F.3d 893, 903 (7th Cir. 2021) ("An ALJ need not rehash every detail each time he states conclusions on various subjects.").

Additionally, even though an ALJ is not required to "march through each opined limitation to explain whether it was consistent with or supported by the record," the ALJ addressed other aspects of Dr. Ahmed's opinion as well. *Cf. Gary R. v. Kijakazi*, No. 20 C 6109, 2022 WL 4607581, at *12 (N.D. Ill. Sept. 30, 2022). He pinpointed specific treatment notes from Dr. Ahmed and other providers regarding Claimant's more frequent presentation without edema and the lack of any leg elevation recommendations. R. 26. Though the ALJ incorrectly stated that Dr. Ahmed did not explain the need for unscheduled breaks or absences, given the other analysis

16

of gaps in supportability and consistency, this factual error is not so serious as to warrant remand. *See Beardsley v. Colvin*, 758 F.3d 834, 837 (7th Cir. 2014).

Still, remand is necessary for the ALJ to properly analyze and sufficiently explain the persuasiveness of Dr. Gaeta's opinion. The ALJ is directed to more clearly articulate how Dr. Gaeta's opinion is supported or not supported by his own explanations and objective medical evidence and is consistent or inconsistent with the other evidence in the record.

## II.  Subjective Symptom Evaluation

Claimant next argues that the ALJ's discussion of her symptoms violated SSR 16-3p because he did not evaluate her reported back and knee pain, difficulty standing and walking, shortness of breath, and other symptoms for consistency. In evaluating a claimant's subjective symptom allegations, an ALJ assesses the objective medical evidence and several other factors, including the claimant's daily activities, effectiveness and side effects of any medication, treatment, other methods to alleviate symptoms, and factors that precipitate and aggravate pain. SSR 16-3p, 2017 WL 5180304, at *5, *7-8 (Oct. 25, 2017); 20 C.F.R. § 404.1529(c). "'An ALJ need not discuss every detail in the record as it relates to every factor,' but an ALJ may not ignore an entire line of evidence contrary to [his] ruling." *Benito M. v. Kijakazi*, No. 20 C 5966, 2022 WL 2828741, at *8 (N.D. Ill. July 20, 2022) (quoting *Grotts*, 27 F.4th at 1278). "As long as an ALJ gives specific reasons supported by the record, [the Court] will not overturn a credibility determination unless it is patently wrong."

17

*Grotts*, 27 F.4th at 1279; *Murphy v. Colvin*, 759 F.3d 811, 816 (7th Cir. 2014) (patently wrong "means that the decision lacks any explanation or support.").

The ALJ adequately showed how Claimant's symptoms were consistent and inconsistent with the medical evidence. After summarizing Claimant's testimony regarding her pain, difficulty walking and standing, shortness of breath, and fatigue, he described inconsistent evidence such as treatment records showing Claimant's generally normal range of motion, sensation, strength, and lack of edema, normal lung examinations and echocardiograms, mild rather than significant knee and pulmonary abnormalities, and alertness, along with providers' recommendations that she exercise. R. 21, 23-25. Further, the ALJ recognized evidence that supported her reported symptoms, such as her degenerative disc and joint disease, osteoporosis, and obesity. *Id.* at 24-25; *Gedatus*, 994 F.3d at 900-01.

But the ALJ did not meaningfully address Claimant's daily activities. The ALJ "noted" Claimant's testimony regarding her challenges in performing certain daily activities such as driving and shopping, but "never said what he made of them." *Sam K. v. Saul*, 391 F. Supp. 3d 874, 881 (N.D. Ill. 2019). He did not "explain how plaintiff's testimony regarding her daily activities lacked credibility or conflicted with the record" or "describe how these difficulties were not as severe as alleged." *Evonne*, 2022 WL 874650, at *6. The Commissioner asserts that the ALJ did not have to address every daily activity. That is true. But here, the ALJ did not engage with any of them. *See Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009) (remanding where the ALJ "briefly described" the claimant's testimony about her activities but did not explain

18

whether her "daily activities were consistent or inconsistent with the pain and limitations she claimed"). Therefore, the ALJ's decision must be remanded for consideration of Claimant's limitations in her daily activities.

## III. RFC Assessment

Claimant lastly argues that the RFC finding was not supported by substantial evidence because it included additional environmental limitations beyond what Dr. Gaeta and the state medical consultants recommended. As other district courts have recognized, this argument is a "prime example of nitpicking that does not help her claim." *See David C. v. Kijakazi*, No. 20 C 3891, 2022 WL 602520, at *9 (N.D. Ill. Mar. 1. 2022) (citing *Patrick C. v. Saul*, 2020 WL 6287370, at *8 (N.D. Ill. Oct. 27, 2020)). If the ALJ was wrong and the Claimant has no issue with exposure to respiratory irritants, dangerous moving machinery, or unprotected heights, it is not at all clear how such an error would further her cause or warrant remand. Surely Claimant is not asking the Court to remand so that an ALJ can find her capable of *greater* work-related activities.

Nevertheless, as part of the required remand for analysis of Dr. Gaeta's opinion, the ALJ will have to reconsider the RFC. Therefore, for the sake of completeness, the Court addresses whether these restrictions are supported by substantial evidence. The ALJ sufficiently tied the restriction on moving machinery and unprotected heights to the evidence indicating instability or limited mobility, such as her reported difficulty standing and walking, degenerative changes in the

19

spine and knee, instances of decreased range of motion, and obesity.[5] But it is unclear how the ALJ construed the record to mean that Claimant's shortness of breath *upon exertion* is related to environmental factors. R. 24; *Tepper v. Colvin*, No. 14 C 2848, 2015 WL 7351692, at *7 (N.D. Ill. Nov. 20, 2015). Neither Claimant's complaints about shortness of breath after walking or any treatment notes or medical opinions provide the missing link. It could be that the ALJ added this limitation to avoid exacerbating Claimant's shortness of breath upon exertion, but he did not say so. On remand, to the extent a restriction on exposure to respiratory irritants is included in the newly considered RFC, the ALJ should more clearly articulate its evidentiary basis.

## Conclusion

For the reasons stated above, the Commissioner's motion for summary judgment is denied, and this case is remanded to the Social Security Administration for further proceedings consistent with this opinion.

ENTERED:

*Thomas M Durkin*

Honorable Thomas M. Durkin
United States District Judge

Dated: November 21, 2022

---

[5] Claimant's assertion that she did not complain of instability is puzzling considering her argument that the ALJ did not credit her complaints of difficulty walking and standing. *Compare* ECF No. 15 at 12 *with id.* at 13.